**SIGNED this 22nd day of February, 2013**

_Shelley D. Rucker_
Shelley D. Rucker
**UNITED STATES BANKRUPTCY JUDGE**

---

### UNITED STATES BANKRUPTCY COURT
### EASTERN DISTRICT OF TENNESSEE
### SOUTHERN DIVISION

In re:

                                                   No.   12-13300
                                                   Chapter 7

DELORESE JUANETTE JAMES,

         Debtors.

### MEMORANDUM

      The trustee Jerrold D. Farinash ("Trustee") objects to the claim of exemption relating to the

IRA of debtor Delorese Juanette James ("Debtor") pursuant to 11 U.S.C. § 522 and Federal Rule

of Bankruptcy Procedure 4003. [Doc. No. 24].   The Debtor has responded to the objection and

claims that all funds in her two individual retirement accounts ("IRAs") at First Tennessee Bank

are exempt. The court held a hearing on the objection and took it under advisement. It has

reviewed the briefing filed by the parties, the stipulated facts and exhibits, and has reviewed the

relevant law.

1

The issue for the court is whether the Debtor engaged in a prohibited transaction that resulted in her IRAs losing their tax exempt status. The Debtor signed applications to open the IRAs which incorporated the terms of a customer agreement. The customer agreement contained a provision granting a security interest in the assets in her IRAs to secure any debt she owed to the custodian of the accounts and to the brokerage firm which handled the transactions for those accounts. The Trustee contends that the mere granting of a security interest, regardless of whether there was any indebtedness for the lien to secure, is a prohibited transaction under the Internal Revenue Code ("IRC"). If the Debtor engages in a prohibited transaction, the IRAs lose their tax exempt status. The Trustee relies on case law that holds that loss of that tax exempt status also results in a loss of the accounts' exempt status under bankruptcy law and applicable state exemptions. The Debtor admits she signed the applications, but argues that the customer agreement also provides that the lien provisions will not apply if they are in conflict with the requirements of the Employment Retirement Income Security Act of 1974 ("ERISA") or the IRC. Based on the language of the operative documents, the court finds that the Debtor did not grant a security interest in the accounts' assets. Therefore, she did not engage in a prohibited transaction, and the IRAs are exempt. Accordingly, the Trustee's objection will be OVERRULED.

The court's ruling is based upon the following findings of fact and conclusions of law made pursuant to Fed. R. Bankr. P. 7052 made applicable to contested matters by Fed. R. Bankr. P. 9014(c). This court has jurisdiction over this contested matter pursuant to 28 U.S.C. § 1332 and § 157(b)(2)(B).

## I.    Background

The parties have provided the court with a stipulation regarding the documents that the

parties contend are relevant to the court's analysis. The stipulated exhibits are described below.
*See* [Doc. No. 45].

    *Account Applications*

    Exhibit 1 consists of the Debtor's "Premiere Select IRA Application" dated May 1, 2008
with First Tennessee Securities, Inc. for a Roth IRA, account number CFJ-491063 ("Roth
Application"). [Doc. No. 45-1]. The Roth Application consists of an eight-page application which
the Debtor completed in order to open her Roth IRA. She selected the Roth IRA option on the first
page and provided her name, address, date of birth, employment, driver's license number, income,
and beneficiary information. *Id.* The Debtor also signed and dated page nine of the Roth
Application, under section 9, entitled "Signatures." *Id.* at Doc. No. 45-1, Ex. 1, p. 9. Section 9
contains several paragraphs of text written in highly compressed, minute font. One of the
paragraphs states in part:

> I represent that I have received and read the Customer Agreement, the appropriate
> Premiere Select IRA Custodial Agreement and Disclosure Statement, of which this
> Application is a part, governing this account and agree to be bound by such
> Agreements as are currently in effect and as may be amended from time to time. . .

[Doc. No. 45-1, Ex. 1, p. 9]. The Roth Application contains no grant of a security interest in the
assets of the account in favor of any party. The Debtor appointed Fidelity Management Trust
Company or its successors as "Custodian of the account" and National Financial Services, LLC as
the "sole carrying Broker/Dealer to perform administrative services." *Id*. The designation for
"Broker/Dealer" is left blank on the Roth Application. The Roth Application is also signed by an
individual designated as the "Registered Rep." in a box which includes the paragraph that the:

> above-named firm hereby accepts its appointment as agent of the Premier Select
> IRA owner named above to execute investment directions and for such other
> purposes as more fully described in the Premier Select IRA and /or Roth IRA

> Custodial Agreement(s) and Disclosure Statement(s) upon the earlier of delivery of
> an instruction, direction, or inquiry or receipt of compensation with respect to the
> above-mentioned account or upon a firm signature.

*Id.* There is no indication on the Roth Application regarding the identity of the "above-named

firm."

In connection with the Roth IRA, the Debtor signed a "Certificate of Disclosure

—Brokerage" as well. *Id.* at [Doc. No. 45-1, Ex. 1, p. 8]. This certificate contains

acknowledgements that the purchases for "this account" (which is never defined) are subject to

investment risk and are being purchased from First Tennessee Brokerage, Inc. ("FTBR"), a

subsidiary of First Tennessee Bank. The Debtor also acknowledges that First Tennessee Bank is

not a registered broker-dealer and that First Horizon Investment Services is a division of FTBR.

Although it is not expressly stated anywhere in the application that FTBR is the appointed

Broker/Dealer, the disclosure, by its inclusion with the Roth Application, implies that FTBR is the

Broker/Dealer. The parties refer to the IRA as being maintained by First Tennessee Securities,

although that name does not appear anywhere in the documents attached to the stipulation.[1]  The

Certificate of Disclosure did not include any language granting a lien to FTBR or any other party.

Exhibit 2 to the Stipulation of Facts is another Premiere Select IRA Application. This time

the Debtor checked the option for a traditional IRA. The Application is dated May 1, 2008 and

relates to account number CFJ-490946 ("Traditional IRA"). Exhibit 2 is the same form completed

in the same manner as the Roth Application. It contains her signature page under Section 9 that

contains language identical to that quoted *supra*. *See* [Doc. No. 45-1, Ex. 2, p. 16]. The Debtor

appoints the same parties in the same capacities as she did in the Roth Application and again leaves

---

1  The parties have not raised the identity of the Broker/Dealer as an issue regarding whether a valid security was
granted to First Tennessee Securities. Therefore, the court will not address whether the failure to identify the Broker/
Dealer affects its analysis of the prohibited transaction issue.

4

the appointment of the Broker/Dealer blank. There is also a Certification of Disclosure

—Brokerage in the same form as the Roth Disclosure included with the Traditional IRA

application, although there is no express identification of the account to which it refers. This

application does not contain any language regarding a lien on the Traditional IRA's assets.

Exhibit 3 contains three pages of "Premiere Select IRA Application Instructions," which

were in effect at the time of the Debtor's bankruptcy filing and which the Debtor presumably read

before signing the applications provided in Exhibits 1 and 2 in 2008. The instructions relating to

"Section 9 Signatures" state:

> Before signing the Application, please carefully read the Premiere Select
> Traditional IRA Custodial Agreement and Disclosure Statement or Premiere Select
> Roth IRA Custodial Agreement and Disclosure Statement, as applicable, as well as
> all sections of the Premiere Select IRA Application, including the Customer
> Agreement. This Application is part of a legal agreement between you, your
> Broker/Dealer, and NFS, and by signing Section 9, you are agreeing to be bound by
> the terms and conditions contained in the above mentioned documents. . . .

[Doc. No. 45-1, Ex. 3, p. 23]. The same individual also signed the Traditional IRA application as

the "registered rep." with the same paragraph regarding being the authorized representative to

execute investment directions below her name. Exhibit 3 also contains a blank application, similar

to the ones the Debtor completed. [Doc. No. 45-1, pp. 24-29].

*Customer Agreements*

Exhibit 3 also includes "various forms used including the IRA and Traditional Custodial

Agreements in effect at the time of filing the bankruptcy proceeding" which occurred on June 28,

2012. [Doc. No. 45, 45-1, Ex. 3, pp. 19-92].The Customer Agreement ("Customer Agreement") in

effect at the time of the Debtor's bankruptcy filing is part of Exhibit 3. [Doc. No. 45-1, Ex. 3, pp.

30-34]. The Customer Agreement is not signed by the Debtor, but her signature on the

Applications is evidence of her agreement to the terms of the Customer Agreement in addition to

the other documents referenced in Section 9. *See id.* The Customer Agreement contains several

provisions relevant to the parties' dispute here. The court will quote these relevant provisions

together for ease of reference, although they are scattered in various sections throughout the

densely-worded, five page, single-spaced agreement. The term "Broker/Dealer" is designated as

"You" in the contract although Broker/Dealer is never identified. Below are various provisions to

which the Debtor agreed:

> I appoint You [Broker/Dealer] as my agent for the purpose of carrying out my
> directions to You in accordance with the terms and conditions of this Agreement
> with respect to the purchase or sale of securities in my account. To carry out your
> duties, You are authorized to place and withdraw orders and take such other steps to
> carry out my directions.

[Doc. No. 45-1, Ex. 3, ¶ 1, p. 30].

> I understand that FMTC [Financial Management Trust Company or its successor],
> Custodian of my Premiere Select IRA or the Trustee of my Premiere Select
> Retirement Plan, as applicable, and NFS [National Financial Services, LLC] do not
> provide any investment advice as [deemed] under the Employee Retirement
> Income Security Act of 1974 (ERISA), the Internal Revenue Code, and/or any
> applicable Securities regulations, in connection with this account, nor does NFS
> give any advice or offer any opinion with respect to the suitability of any security or
> order. . . .

[Doc. No. 45-1, Ex. 3, ¶ 4, p. 30].

> . . . . I [Debtor] also understand that You [Broker/Dealer] do not provide tax advice
> concerning my account or any securities that may be the subject of removal from or
> reinstatement into my account and I agree to consult with my tax advisor
> concerning any tax implications that may arise as a result of any of these
> circumstances.

[Doc. No. 45-1, Ex. 3, ¶ 15, p. 31].

> In the event I become indebted to You [Broker/Dealer] or NFS in the course of
> operation of this account, I agree that I will repay such indebtedness upon demand.
> ***All securities*** and other property now or hereafter held, carried, or maintained by

6

NFS for any of my brokerage accounts, now or hereafter opened, including brokerage accounts in which I may have an interest, including, but not limited to, assets held in bank sweep product, ***shall be subject to a lien for the discharge of all of my indebtedness and other obligations of the undersigned to You or NFS and are held by NFS as security for the payment of any of my liability or indebtedness to You or NFS in any of the said brokerage accounts.*** You and NFS shall have the right to sell, assign, or transfer securities, withdraw any funds from a bank sweep product, and apply, as appropriate, or any other property so held by You or NFS, from or to any other of my brokerage accounts whenever in your judgment You or NFS consider such a transfer necessary for protection in enforcing your lien. You or NFS shall have the discretion to determine which securities and property are to be sold or withdrawn, and which contracts are to be closed. ***No provision of this Agreement concerning liens or security interests shall apply to the extent such application would be in conflict with any provisions of ERISA or the Internal Revenue Code or any related rules, regulations or guidance.***

[Doc. No. 45-1, Ex. 3, ¶ 16, p. 31-32 (emphasis added)].

No waiver of any provision of this Agreement shall be deemed a waiver of any other provision, nor a continuing waiver to the provision so waived. No provision of this Agreement can be amended or waived, except by an authorized representative of NFS.

[Doc. No. 45-1, Ex. 3, ¶ 19, p. 32].

I understand that sufficient funds must be in my account at the time I place any order to buy securities, including transaction costs and any applicable commissions or fees in addition to other amounts FMTC, NFS, or You may deem necessary.

[Doc. No. 45-1, Ex. 3, ¶ 20, p. 32].

. . . By signing the Account Application, I represent that I have read this Customer Agreement and understand, authorize and consent to my Broker/Dealer changing my core account investment vehicle if it becomes unavailable due to circumstances beyond the control of my Broker/Dealer to another money market mutual fund or bank sweep product, if available, in accordance with applicable rules and regulations, including the Internal Revenue Code and ERISA.

[Doc. No. 45-1, Ex. 3, ¶ 21, p. 32].

Exhibit 4 contains the version of the Customer Agreement that was in effect in 2008 when

the Debtor signed the agreements which would have accompanied the Roth and Traditional

Applications. Paragraph 1 appointing the Broker/Dealer as the agent to carry out the instructions is

the same. [Doc. No. 45-1, Ex. 4, ¶ 1, p.102]. Like the 2012 version, no investment advice would be

provided by NFS or FMTC. *Id.* ¶ 4. The account was to be invested in accordance with the

instructions of the Debtor "as given from time to time to You [Broker/Dealer]". *Id.* at ¶ 26, p. 104.

The security interest was addressed in almost identical terms as it was in the 2012 version:

> In the event I become indebted to You [Broker/Dealer] in the course of operation of
> this account, I agree that I will repay such indebtedness upon demand. ***All
> securities*** and other property now or hereafter held, carried, or maintained by NFS
> for any of my brokerage accounts, now or hereafter opened, including brokerage
> accounts in which I may have an interest, ***shall be subject to a lien for the
> discharge of all of my indebtedness and other obligations of the undersigned to
> You and are held by NFS as security for the payment of any of my liability or
> indebtedness to You or NFS in any of the said brokerage accounts.*** You shall
> have the right to sell, assign, or transfer securities, or any other property so held by
> You, from or to any other of my brokerage accounts whenever in your judgment
> You consider such a transfer necessary for protection in enforcing Your lien. You
> shall have the discretion to determine which securities and property are to be sold
> and which contracts are to be closed. ***No provision of this Agreement concerning
> liens or security interests shall apply to the extent which application would be in
> conflict with any provisions of ERISA or the Internal Revenue Code or any
> related rules, regulations or guidance.***

[Doc. No. 45-1, Ex. 4, ¶ 13, p.103 (emphasis added)]. Like the later agreement, the Debtor needed

to maintain sufficient in the account funds for any transaction, including the fees. *Id.* at ¶17. Both

agreements were governed by the laws of Massachusetts. [Doc. No. 45-1, Ex. 4, p. 104, ¶ 29];

[Doc. No. 45-1, Ex. 3, p. 33, ¶ 32].

*Custodial Agreements*

Exhibit 3 also contains a copy of the "Traditional Custodial Agreement and Disclosure

Statement" and the "Roth IRA Custodial Agreement and Disclosure Statement" in effect at the

time of the Debtor's filing. [Doc. No. 45-1, Ex. 3, pp. 47-91]. The IRA Custodial Agreement states

that, "[t]he Depositor whose name appears on the accompanying Application is establishing a

8

traditional individual retirement account (under Section 408(a) of the Internal Revenue Code) to

provide for his or her retirement and for the support of his beneficiaries after death." *Id.* at p. 48.

Article IV of the IRA Custodial Agreement states that "[n]otwithstanding any provision of

this agreement to the contrary; the distribution of the Depositor's interest in the Custodial Account

shall be made in accordance with the following requirements and shall otherwise comply with

section 408(a)(6) and the regulations thereunder, the provisions of which are herein incorporated

by reference." [Doc. No. 45-1, Ex. 3, Art. IV, p. 48].

Articles V through VII contain further information pertaining to the IRS:

Article V
. . . The Custodian agrees to submit to the Internal Revenue Service (IRS) and
Depositor the reports prescribed by the IRS.
Article VI
Notwithstanding any other articles which may be added or incorporated, the
provisions of Articles I through III and this sentence will be controlling. Any
additional articles inconsistent with section 408(a) and the related regulations will
be invalid.
Article VII
This agreement will be amended as necessary to comply with the provisions of the
Code and the related regulations. . . .

[Doc. No. 45-1, Ex. 3, Arts. V-VII, p. 49].

The IRA Disclosure Statement indicates that "[n]either the Custodian, the Company nor

any affiliate or other Fidelity Investments company provides tax or legal advice. You are strongly

encouraged to seek competent tax or legal advice for any and all matters regarding this Account, as

such matters may result in adverse tax consequences and/or penalties." [Doc. No. 45-1, Ex. 3, p.

61].

Under the section of the Disclosure Statement entitled "Miscellaneous" a provision is

included entitled "IRA Approval." This section states, "[t]he form of your Individual Retirement

9

Account is the model government form provided by the IRS known as Form 5305-A. Please refer to IRS Publication 590 or contact the IRS for more information on IRAs, as transactions done incorrectly may result in adverse tax consequences." [Doc. No. 45-1, Ex. 3, p. 67]. The Roth IRA Disclosure Statement contains similar information. *See id.* at Ex. 3, p. 85.

Exhibit 4 is a blank application for an IRA, along with a Customer Agreement that was in effect in 2008 when the Debtor signed the Applications. [Doc. No. 45-1, Ex. 4, pp. 92-105]. Paragraph 13 of the 2008 Customer Agreement contains a lien provision that is highly similar to the one quoted *supra*. *Id.* at p. 103.

*No Actual Debt owed to FMTC or NFS*

The parties agree that there were no loans made to the Debtor and that the Debtor has never traded on margin with either account. The Trustee relies solely on the provision in the Customer Agreements which grants a security interest in the assets in the IRAs to secure any indebtedness owed to Broker/Dealer or NFS as his evidence of a prohibited transaction.

**II.    Analysis**

**A.    Relevant Bankruptcy Code, Tennessee Statutory and Internal Revenue Code Provisions**

When a debtor files a petition in bankruptcy an estate is created that contains "all legal or equitable interests of the debtor in property as of the commencement of the case" "wherever located and by whomever held. . . ." 11 U.S.C. § 541(a)(1). Pursuant to 11 U.S.C. § 522(b) a debtor can exempt certain property from the bankruptcy estate by claiming an exemption. Such exemption rights are established at the date of the filing of the bankruptcy petition. *See e.g., In re Chapman*, 424 B.R. 823, 826 (Bankr. E.D. Tenn. 2010); *In re Sutton-Robinson*, 472 B.R. 77, 84 (Bankr. D. Ariz. 2012). Pursuant to Fed. R. Bankr. P. 4003, a party in interest may object to a

10

claimed exemption; however, such party "has the burden of proving that the exemptions are not properly claimed." Fed. R. Bankr. P. 4003.

In this case, the Debtor has claimed an exemption in a First Tennessee IRA under 11 U.S.C. § 522(d)(12). [Doc. No. 1, Schedule C]. There is no differentiation in her schedules between the Roth IRA and the Traditional IRA. The Trustee's objection refers to her exemption in the First Tennessee IRA. Since the parties have not raised an issue regarding whether one or both accounts were exempted but have stipulated to documents for both, the court will consider that both IRAs were claimed as exempt. She placed a value on the IRAs of $36,858.91. *Id.* The Trustee has filed a timely objection to that claim of exemption.

The Bankruptcy Code exempts "[r]etirement funds to the extent that those funds are in a fund or account that is exempt from taxation under section . . . 408 . . . of the Internal Revenue Code of 1986." 11 U.S.C. §§ 522(d)(12); 522(b)(2); 522(b)(3)(C). Tennessee law also provides that, subject to certain restrictions, "any funds or other assets payable to a participant or beneficiary from, or any interest of any participant or beneficiary in, a retirement plan which is qualified under § . . . 408 and 408A, . . . of the Internal Revenue Code of 1986, as amended, are exempt from any and all claims of creditors of the participant or beneficiary, except the state of Tennessee." Tenn. Code Ann. § 26-2-105(b).

In order to determine whether a plan is qualified, the Bankruptcy Code further provides:

For purposes of paragraph (3)(C) and subsection (d)(12), the following shall apply:
(A) If the retirement funds are in a retirement fund that has received a favorable determination under section 7805 of the Internal Revenue Code of 1986, and that determination is in effect as of the date of the filing of the petition in a case under this title, those funds shall be presumed to be exempt from the estate.
(B) If the retirement funds are in a retirement fund that has not received a favorable determination under such section 7805, those funds are exempt from the estate if the debtor demonstrates that—

11

> (i) no prior determination to the contrary has been made by a court or the
> Internal Revenue Service; and
> (ii)(I) the retirement fund is in substantial compliance with the applicable
> requirements of the Internal Revenue Code of 1986; or
> (II) the retirement fund fails to be in substantial compliance with the
> applicable requirements of the Internal Revenue Code of 1986 and the
> debtor is not materially responsible for that failure.

11 U.S.C. § 522(b)(4)(A)-(B). The parties did not stipulate whether these IRAs are

retirement funds that have received a favorable determination. The Premier Select IRA

Disclosure Statement indicates under the heading IRS Approval, "The form of your

individual retirement Account is the model government form provided by the IRS known

as Form 5305-A. Please refer to IRS Publication 590 or contact the IRS for more

information on IRAs, as transactions done incorrectly may result in adverse tax

consequences." [Doc. No. 45-1, Exhibit 3, p. 67]. Neither party has addressed what the

implications of that statement are to the issue of whether the presumption applies. The

court will presume that there was a favorable determination and that the Trustee has

waived any objection based upon lack of a favorable ruling by the Internal Revenue

Service. *In re Willis*, No. 07-11010-BKC-PGH, 2009 WL 2424548, at *5 (Bankr. S.D. Fla.,

August 6, 2009) (relying on *Taylor v. Freeland & Kronz*, 503 U.S. 638, 642 (1992) and

presuming a favorable determination based on statement in Merrill Lynch Agreement that

"the Internal Revenue Service has approved the Merrill Lynch IRA Custodial Agreement.

Approval by the IRS is a determination as to the form, not the merits, of this IRA").

The Trustee is then left with rebutting the presumption. As evidence that the IRAs

have lost their status as individual retirement accounts, he offers the Debtor's agreement to

be bound by the term in the Customer Agreement which grants a lien in the account assets

to the Broker/Dealer and NFS. If those agreements do grant a lien to a fiduciary, the Debtor

faces the loss of the bankruptcy exemption.

Section 408 of the IRC establishes guidelines for tax-exempt status of retirement accounts

for purposes of the IRS. *See* 26 U.S.C. § 408. Section 408(e)(2) provides that a retirement account

ceases to be an individual retirement account if the owner of the account "engages in any

transaction prohibited by section 4975 with respect to such account. . . ." 26 U.S.C. § 408(e)(2)(A).

The IRC defines "prohibited transaction" to include "any direct or indirect": . . .

> (A) sale or exchange, or leasing, of any property between a plan and a disqualified
> person;
> (B) lending of money or other extension of credit between a plan and a disqualified
> person;
> (C) furnishing of goods, services, or facilities between a plan and a disqualified
> person;
> (D) transfer to, or use by or for the benefit of, a disqualified person of the income or
> assets of a plan;
> (E) act by a disqualified person who is a fiduciary whereby he deals with the
> income or assets of a plan in his own interest or for his own account; or
> (F) receipt of any consideration for his own personal account by any disqualified
> person who is a fiduciary from any party dealing with the plan in connection with a
> transaction involving the income or assets of the plan.

26 U.S.C. § 4975(c)(1). The term "plan" includes an individual retirement account. 26 U.S.C. §

4975(e)(1)(C). The term "disqualified persons" includes "a fiduciary" and "a person providing

services to the plan." 26 U.S.C. § 4975(e)(2)(A)-(B). "A fiduciary" is in turn defined as:

> Any person who—
>
> (A) exercises any discretionary authority or discretionary control respecting
> management of such plan or exercises any authority or control respecting
> management or disposition of its assets,
> (B) renders investment advice for a fee or other compensation, direct or indirect,
> with respect to any moneys or other property of such plan, or has any authority or
> responsibility to do so, or
> (C) has any discretionary authority or discretionary responsibility in the
> administration of such plan.

13

26 U.S.C. § 4975(e)(3). The Debtor, as the owner of the account with the authority to manage or

dispose of the assets, is a fiduciary. It is more difficult to tell whether the Broker/Dealer is also a

fiduciary due to the ambiguity in the identity of the Broker/Dealer. The Trustee argues that by

signing the application which also provided her assent to the lien provisions of the Customer

Agreement, the Debtor engaged in a prohibited transaction under Section 4975(c)(1)(B). The

Debtor argues that there was no actual lending which occurred and that the granting of a lien alone

is not sufficient to disqualify the accounts. Alternatively, the Debtor argues that the lien provisions

did not grant a lien because of the additional language in those provisions that make the liens

inapplicable if they conflict with ERISA or the IRC. [2012 Customer Agreement, Doc. No. 45-1,

Ex. 3, ¶ 16, p. 31-32]; [2008 Customer Agreement, Doc. No. 45-1, Ex. 4, ¶ 13, p.103] (the "Lien

Provisions"). The Trustee dismisses the ability of the additional language to save the tax exempt

status. He argues that the lien is invalidated only if there is a conflict with the statutes mentioned,

not if the Debtor makes a decision to engage in a prohibited transaction.

**B.      The *In re Daley* Decisions**

The mere signing of an agreement containing a pledge of the assets of an IRA has been

held to be a prohibited transaction which resulted in the loss of the bankruptcy exemption. The

bankruptcy court in *In re Daley*, 459 B.R. 270 (Bankr. E.D. Tenn. 2011) and the district judge in

*Daley v. Mostoller (In re Daley)*, No. 3:11-cv-565 (E.D. Tenn. Sept. 17, 2012) reached this

conclusion in a case involving a Merrill Lynch IRA. The bankruptcy court found that the debtor

"never borrowed from his IRA account or requested a margin loan against his funds." *In re Daley*,

459 B.R. at 278. However, the court found that the debtor had agreed in the terms and conditions

section of his client relationship agreement with Merrill Lynch that "Merrill Lynch has a lien on

14

[his] accounts and amounts in those accounts for any payment obligations [he has] with Merrill

Lynch." *Id.* The court concluded that "[t]his grant of a lien at the IRA's inception constituted an

extension of credit or guarantee, which is a prohibited transaction under 26 U.S.C. §

4975(c)(1)(B)." *Id.* The court continued, "[a]s incongruous as it appears, based upon the language

of the Client Relationship Agreement signed by the Debtor, the mere opening of the Merrill Lynch

IRA caused the Debtor to participate in a prohibited transaction under § 4975." *Id.* at 279. The

court thus concluded that the IRA was non-exempt. *Id.* at 281. Although this court does not have

the benefit of the entire Merrill Lynch client relationship agreement, the bankruptcy court did not

cite any language in the *Daley* lien provision itself that would invalidate the lien if it were in

conflict with ERISA or the IRC.

 In reaching its decision, the bankruptcy court relied on an advisory opinion from the

Department of Labor regarding prohibited transactions under § 4975, *Dep't of Labor Op. No.*

*2009-03A*. The bankruptcy court quoted the advisory opinion at length, and noted that "[a]lthough

not binding on the court, the October 27, 2009 advisory opinion is nonetheless instructive and

persuasive . . . ." *Id.* at 280. In the advisory opinion the Department of Labor noted, "[i]t is the

opinion of the Department that the grant by the IRA owner to the Broker of a security interest in his

non-IRA accounts in order to cover indebtedness of, or arising from, his IRA, as you describe,

would be a prohibited transaction under Code section 4975(c)(1)(B)." *Id.* at 279 (quoting *Dep't of*

*Labor Op. No. 2009-03A* at 1-3). The bankruptcy court held that:

> Through no fault of his own and notwithstanding the fact that between its creation
> and the filing date, the Debtor conducted no borrowing transactions against the
> Merrill Lynch IRA, the Debtor indirectly engaged in a prohibited transaction under
> 26 U.S.C. § 4975 simply by signing the Client Relationship Agreements granting
> Merrill Lynch a lien on all of his accounts. Accordingly, the Debtor is not entitled
> to an exemption in the Merrill Lynch IRA holding $61,646.00 from a rollover

which occurred on May 16, 2008.

*In re Daley*, 459 B.R. at 280. The bankruptcy court issued its decision on October 11, 2011.

The bankruptcy decision was appealed to the district court where it was referred to the magistrate for report and recommendation. The district court affirmed the report and recommendation of the magistrate judge and affirmed the bankruptcy court's decision. *See Daley*, No. 3:11-cv-565 (E.D. Tenn. Sept. 17, 2012). The magistrate judge noted that the debtor/appellant had "specifically endorsed the Client Relationship Agreement." *Id.* at p. 6. The debtor had signed the specific client relationship agreement "pledging a lien against the IRA in favor of Merrill Lynch." *Id.* The district court, addressing 11 U.S.C. § 522(b)(4)(A)-(B), concluded that "having signed the Client Relationship Agreement, appellant is materially responsible for the failure of the IRA to meet the requirement that it not engage in a prohibited transaction." *Id.* at p. 12. The district court affirmed the determination that the appellant had engaged in a prohibited transaction and that his IRA was not exempt property under Section 522. Neither the magistrate nor the district court judge mentions whether there was any limitation on the grant of the security interest contained in the Merrill Lynch customer agreement.

### C.    Evolution of the Relevant Law Following *In re Daley*

Following the bankruptcy court decision in *In re Daley*, another court addressed the repercussion of the rule announced in the *Daley* decision. In *Yoshioka v. Charles Schwab Corp.*, the district court examined the claims of a putative class of "over four million IRA account holders containing upwards of $384 billion in assets." No. C-11-1625EMC, 2011 WL 6748984, at *1 (N.D. Cal. Dec. 22, 2011). The plaintiffs' claims included allegations that the defendant financial institutions took security interests and liens in the assets of the IRAs. The plaintiffs alleged that

16

provisions in the IRA agreements creating liens constituted "prohibited transactions" under 26

U.S.C. § 4975(c)(1)(B) that caused the IRAs to lose their tax exempt status. The plaintiffs had

initially sought declaratory and injunctive relief, restitution, disgorgement, damages, and an order

imposing a constructive trust and were now seeking approval of a class settlement of the issues. *Id.*

at \*2. The court addressed the proposed settlement of the plaintiffs' claims to determine whether it

was fair, reasonable and adequate pursuant to Fed. R. Civ. P. 23(e)(1)(C). In considering the

fairness of the proposed settlement, the court noted the potential repercussions of finding the IRA

to be non-exempt from taxation:

> Should Plaintiff prevail in proving Schwab was responsible for creating a
> prohibited transaction, Schwab's exposure would be substantial. First, it may be
> responsible for any tax liability incurred by Plaintiff. Second, Plaintiff faces an
> additional risk of liability to third parties. IRAs are typically exempt from a
> debtor's estate in bankruptcy so long as they maintain their exemption from
> taxation. . . . Accordingly, should the Schwab IRAs at issue here be deemed to have
> entered into a prohibited transaction because of the disputed language in the
> account agreements, class members' IRAs may no longer be protected from
> creditors.

2011 WL 6748984 at \*7.

The district court then addressed the ruling in *In re Daley* and discussed whether the

addition of language applied retroactively that attempted to cure the deficiency in the IRA

agreements would provide a fair and adequate solution to the potential problem of the IRS

determining the IRAs to be non-exempt. 2011 WL 6748984 at \*7-12. The court noted that

> [w]hile *Daley* involved account language different from that employed by Schwab,
> it is not clear that the difference is material. Importantly, the bankruptcy court
> relied on a Department of Labor opinion addressing similar language to conclude
> that a prohibited transaction occurs whether the security interest is 'in a client's
> personal, non-IRA accounts,' or directly 'in the IRA's assets.'

*Id.* at \*8 (citing *In re Daley*, 459 B.R. at 279-80 and quoting *Dep't of Labor Op. No.* 2009-03A at

1-3).

The court then noted that "recent action by both the DOL and IRS indicates that the

interpretation of account language similar to Schwab's, and the question of whether such language

creates a prohibited transaction (and what to do if it does), are in flux and may be addressed by one

or both agencies in the coming months." 2011 WL 6748984 at *11. The court then cited *Dep't of*

*Labor Adv. Op.* 2011-09A and IRS Announcement 2011-81. *Id.* It determined that there was no

assurance that the class would be protected by the defendant's attempt to add language

retroactively to the IRA agreements that indicated its terms were not meant to be prohibited

transactions pursuant to Sections 408 or 4975 of the IRC. It was possible that a bankruptcy court or

the IRS might not agree that the retroactive language satisfied the requirements of Section 4975.

*Id.* at *13. The court concluded that it would deny the motion to approve the class settlement

because it was not clear that it was fair and reasonable because it might not solve the prohibited

transaction problem, provided for no damages to the class, and made the class waive all of their

possible claims against the defendant. *Id.*

The court in *Yoshioka* cited the following IRS "Announcement" as evidence of a legal

issue "in flux." The Announcement was issued in response to questions raised by the *Department*

*of Labor's Op. Nos.* 2009-03A and 2011-09A.

> **Relief with Respect to IRAs Whose Owners Have Entered into Certain
> Agreements with Brokers or Other Financial Institutions.**
>
> This announcement provides temporary relief with respect to Individual
> Retirement Accounts (IRAs) in circumstances in which the IRAs' owners have
> signed certain indemnification agreements or granted certain security interests in
> accounts that may have an effect on their IRAs.
>
> On October 20, 2011, the Department of Labor (DOL) issued Advisory Opinion
> 2011-09A regarding circumstances under which an individual IRA owner's

agreement to indemnify a broker in order to cover indebtedness of, or arising from, the individual's IRA with the broker would be an impermissible "extension of credit," as described in § 4975(c)(1)(B) of the Code and whether, in such cases, any prohibited transaction would be covered by DOL class exemption PTE 80-26. Subsequent to the issuance of Advisory Opinion 2011-09A, similar issues have been raised regarding the IRA owner's grant of a security interest among the non-IRA accounts and the IRA (referred to collectively as cross-collateralization agreements) with a broker or other financial institution. Previously, on October 27, 2009, the DOL issued Advisory Opinion 2009-03A, holding that the grant by an individual to a broker of a security interest in the individual's non-IRA accounts with the broker would be an impermissible extension of credit to the individual's IRA, as described in § 4975(c)(1)(B) of the Code. Advisory Opinion 2011-09A concludes that PTE 80-26 does not provide relief for such extensions of credit.

The DOL has advised the Internal Revenue Service (IRS) that DOL is considering further action with respect to the issues described above, including consideration of a class exemption request expected to be submitted to the DOL. Pending further action by the DOL and until issuance of further guidance from the IRS superseding this announcement, the IRS will determine the tax consequences relating to an IRA without taking into account the consequences that might otherwise result from a prohibited transaction under § 4975 resulting from entering into any indemnification agreement or any cross-collateralization agreement similar to the agreements described in DOL Advisory Opinions 2009-03A and 2011-09A, provided there has been no execution or other enforcement pursuant to the agreement against the assets of an IRA account of the individual granting the security interest or entering into the cross-collateralization agreement. No inference with respect to the application of any Code section other than § 4975 should be drawn from this announcement.

IRS Announcement 2011-81, 2011-52 I.R.B. 1052, 2011 WL 6175122 (Dec. 27, 2011).

### D.    Facts Distinguishing this Case from Facts in *In re Daley*

If this court were bound by the district court decision in *In re Daley*[2], the court would still

---

2  The court concludes that it is not bound by the district court decision in *In re Daley*. The court recognizes that there is a split in authority regarding the binding nature of a district court decision on a bankruptcy court within the same district. *See e.g., In re Romano*, 350 B.R. 276 (Bankr. E.D. La. 2005) (examining split in authority). However, the majority view is "that a single decision of a district court in this multi-judge district is not binding on this court." *Id.* at 281. *See also, First of America Bank v. Gaylor (In re Gaylor)*, 123 B.R. 236 (Bankr. E.D. Mich. 1991); *In re Villarreal*, 413 B.R. 633, 641 (Bankr. S.D. Tex. 2009). *See also, In re Silverman*, 616 F.3d 1001, 1005 n.2 (9th Cir. 2010). Even the courts who have determined that a bankruptcy court is bound by district court

have to address the language of the Lien Provisions in this case which are distinguishable from the language present in *In re Daley*. Although the court does not have access to the IRA agreements at issue in *In re Daley*, it appears from the bankruptcy court's opinion that "under the Terms and Conditions section of the Client Relationship Agreement, which applies to all of his accounts with Merrill Lynch, the Debtor expressly agreed that 'Merrill Lynch has a lien on [his] accounts and amounts in those accounts for any payment obligations [he has] with Merrill Lynch.'" 459 B.R. at 278. Although the Debtor also incorporated the provisions of the Customer Agreement by reference in both her IRA applications, the Roth and Traditional Customer Agreements include a qualification that does not appear to have been present in the client agreement at issue in *In re Daley. See* [Doc. No. 45-1, Ex. 1, p. 9].The 2012 Lien Provisions state that, "No provision of this Agreement concerning liens or security interests shall apply to the extent such application would be in conflict with any provisions of ERISA or the Internal Revenue Code or any related rules, regulations or guidance." [Doc. No. 45-1, Ex. 3, p. 32, ¶ 16]. The 2008 Lien Provision is worded slightly differently. "***No provision of this Agreement concerning liens or security interests shall apply to the extent which application would be in conflict with any provisions of ERISA or the Internal Revenue Code or any related rules, regulations or guidance.***" [Doc. No. 45-1, Ex. 4, p. 103, ¶ 13 (emphasis added)]. The court does not find the difference in the two versions material to its analysis. In either version, the Debtor and the Broker/Dealer for the account expressly agreed that compliance with ERISA and the IRC were more important than the application of the lien. So

decisions within the same district have made such a determination only with respect to published decisions within the district. *See In re Romano*, 350 B.R. at 279-80 (citing *In re Phipps*, 217 B.R. 427, 431-32 (Bankr. W.D.N.Y. 1998) *abrogated on other grounds by Denton v. Hyman (In re Hyman)*, 502 F.3d 61 (2d Cir. 2007)). Although the bankruptcy court's decision is published, it does not appear that Judge Varlan's opinion affirming the bankruptcy court's decision has been published.

much so that they agreed the lien would not be applied at all if a conflict existed. This interpretation of the language is bolstered by other provisions in the various agreements that indicate that the parties intended the IRAs to meet the requirements of the IRC for exempt IRAs. For example, the IRA Custodial Agreement also states that "[n]otwithstanding any provision of this agreement to the contrary; the distribution of the Depositor's interest in the Custodial Account shall be made in accordance with the following requirements and shall otherwise comply with section 408(a)(6) and the regulations thereunder, the provisions of which are herein incorporated by reference." [Doc. No. 45-1, Ex. 3, Art. IV, p. 48]. Further, other articles in the Custodial Agreement indicate that provisions that are inconsistent with the IRC's section 408 are invalid or should be amended as necessary to ensure compliance. Based on this language as the expressed intent of the parties, the court finds that this agreement is distinguishable from the one at issue in *In re Daley*. The parties expressed their intention to comply with IRC section 408 and to make the IRA agreement provisions meet such requirements. [Doc. No. 45-1, Ex. 3, Arts. IV-VII, pp. 48-49]. Further, the parties did in fact comply with the ERISA provisions relating to lending. There were no loans or margin trades on the accounts. There is no evidence that there was any enforcement of the lien by the Broker/Dealer.

Further, the court concludes that compliance with IRC section 408 is a condition precedent to enforceability of the Lien Provisions. As noted *supra*, Massachusetts law applies to the interpretation of the Roth and Traditional Customer Agreements. *See* [Doc. No. 45-1, Ex. 4, p. 104, ¶ 29]; [Doc. No. 45-1, Ex. 3, p. 33, ¶ 32]. Massachusetts courts have addressed the determination of whether a condition precedent to a contract exists. *See e.g., Massachusetts Municipal Wholesale Elec. Co. et al. v. Town of Danvers et al.*, 577 N.E.2d 283 (Mass. Sup. Ct.

21

1991). In the *Town of Danvers* case the Massachusetts Supreme Court explained:

> A condition precedent defines an event which must occur before a contract
> becomes effective or before an obligation to perform arises under the contract. If
> the condition is not fulfilled, the contract, or the obligations attached to the
> condition, may not be enforced.
>
> Parties to a contract, of course, are free to create whatever conditions precedent
> they choose. When construing a contract, a court looks to the parties' intent to
> determine whether they have created a condition precedent. To ascertain intent, a
> court considers the words used by the parties, the agreement taken as a whole, and
> surrounding facts and circumstances.
>
> The words used by the parties in the [contracts at issue] are a significant indication
> of whether a condition precedent was intended. "Emphatic words" are generally
> considered necessary to create a condition precedent that will limit or forfeit rights
> under an agreement. . . .
>
> However, emphatic or precise words are not absolutely necessary to create a
> condition. In the absence of the usual words, a condition precedent may
> nonetheless be found to exist if the intent of the parties to create one is clearly
> manifested in the contract as a whole.

*Id.* at 45-46 (citing 5 S. Williston, Contracts § 663 (3d ed. 1961 & Supp. 1990); Restatement

(Second) of Contracts §§ 225, 226 (1981)) (other citations omitted).

In the proceeding here, the parties specifically provided in the relevant agreements that a

determination by the IRS that a pledge was in conflict with the IRC terms for operating an

individual retirement account would prevent the "application" of the lien. The court concludes that

the parties intended to create a condition precedent, as defined by Massachusetts law, requiring

that the Lien Provision comply with the applicable IRA regulations under the IRC before the lien

could be enforced.

The court is not persuaded by the Trustee's argument that the application of the Lien

Provisions would not be in conflict with ERISA and the IRC. The IRA documents are laden with

provisions that evidence the parties' attempts to comply with ERISA and the IRC for the purpose

22

of ensuring the tax exempt status of the accounts. The Custodial Agreement is modeled on the IRS

form. The Customer Agreement limits transactions in such a way as to avoid indebtedness from

trading in the account and to prevent distributions that would result in disqualification. Based on

the documents provided in the Stipulation, the court finds that the Trustee has not carried his

burden of showing that a lien was granted that could be applied in such a way that it would be

considered a prohibited transaction, especially in light of the IRS's most recent announcement. To

find a prohibited transaction under the facts of this case, the court would have to ignore language in

the Lien Provisions that provided that the security interest would never apply if it conflicted with

ERISA or the IRC.

### F.     Legal Reasons to View Expansion of the *In re Daley* Decisions with Caution

The court is unwilling to expand the ruling in *In re Daley* to find that the act of merely

signing an agreement which grants a lien that (a) secures no actual lending obligation, (b) has

never been enforced, and (c) self destructs if it conflicts with what is allowed by ERISA and the

IRC is sufficient to result in the loss of an exemption. The Department of Labor has advised the

IRS that it is giving further consideration to this issue of whether the grant of a lien under

circumstances such as this case should be a prohibited transaction exemption. The parties have

informed the court that the appellant has appealed the *In re Daley* decision to the Sixth Circuit. The

Sixth Circuit has not yet ruled on the issue. In addition, the IRS has issued IRS Announcement

2011-81 that provides for temporary relief for IRA owners subject to certain IRA agreements

granting a lien or security interest to their brokers or financial institutions. *See* IRS Announcement

2011-81, 2011 WL 6175122. Based on the IRS's clear indication that it is offering temporary relief

regarding whether the grant of a lien or security interest to the IRA owner destroys the exemption

23

status of the IRA, the court determines that sustaining the Trustee's objection would be

inappropriate at this time. The IRS website indicates that "[p]ending additional guidance, the IRS

will not take any action against an IRA solely because it's involved in one of these

[indemnification or cross-collateralization] agreements, provided no action has been taken under

such agreement against the IRA assets."

http://www.irs.gov/Retirement-Plans/Employee-Plans-News---December-16,-2011---Certain-Ag

reements-Affecting-IRAs.

### III.    CONCLUSION

The Trustee has not overcome the presumption that the IRAs are qualified based on the

language in the Lien Provisions themselves and in light of the IRS's announcement that it is taking

no action based on grants of security interests in brokerage agreements where no enforcement has

occurred. The court finds that the facts in this case are distinguishable from the facts in *In re Daley*.

For these reasons, the court will OVERRULE the objection to the Debtor's exemption of the IRAs.


###